Filed 10/27/21  In re J.G. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L.G., <br><br> Defendant and Appellant. | G060062 <br><br> (Super. Ct. No. 19DP1290) <br><br> O P I N I O N |

Appeal from postjudgment orders of the Superior Court of Orange County, Robert Gerard, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

This is an appeal in a juvenile dependency proceeding. Following a pattern that we, sadly, see all too frequently, L.G. (Father) had his reunification services terminated but then, at the last possible moment, began making positive, genuine changes in his life to address the drug addiction that led to the removal of his child. On the day of the Welfare and Institutions Code section 366.26 hearing (.26 hearing),[1] Father filed a petition under section 388 seeking additional reunification services. The court held an evidentiary hearing and gave careful consideration to the matter, but ultimately determined that Father's circumstances, though moving in the right direction, had not sufficiently changed to warrant a change in the court's previous order. It proceeded to terminate Father's parental rights and select adoption as the child's permanent plan.

On appeal, Father contends the court abused its discretion in denying his section 388 petition. While we join the trial court in expressing our admiration of Father's genuine effort at reforming his life, as a legal matter, there is simply nothing in the record to suggest the trial court abused its discretion. Father also contends the court erred in terminating his parental rights because the parent/child bond exception applied. However, he failed to raise that issue in the trial court and thus waived it. Accordingly, we affirm.

FACTS

*Detention*

In October 2019, one-day-old J.G. was taken into protective custody after both the child and the mother tested positive for methamphetamine after J.G.'s birth. M.R. (Mother) also had a preliminary toxicology screen for methamphetamine and admitted both to illicit drug use and alcohol abuse during the pregnancy. In addition,

---

[1]     All statutory references are to the Welfare and Institutions Code.

Mother admitted to abusing drugs with Father during her pregnancy, noting that she used methamphetamine with Father just three days prior to the child's birth. Father alternatively denied having used illicit drugs for about a year but admitted to the recent use with Mother. Father also denied the need for drug treatment. Father claimed to have used drugs with Mother to not be a "'party pooper.'"

Mother and Father had a history of domestic violence with a criminal restraining order issuing against Father in 2018. The parents had continuing contact in violation of that order.

Mother self-reported being diagnosed with bipolar disorder and was prescribed psychotropic medications. Additionally, neither parent had stable housing.

On October 18, 2019, SSA filed a section 300, subdivision (b)(1) jurisdictional petition detailing both parents' unresolved drug abuse issues, their history of domestic violence, and Mother's mental health issues. Three days later, the juvenile court ordered J.G. detained from parental custody pending jurisdictional proceedings. The parents were granted six hours of supervised visitation a week, with the parents to visit separately. That same day, SSA placed the child with the paternal grandparents.

*Jurisdiction and Disposition*

As of late November 2019, Father was visiting consistently with J.G., with the paternal grandmother noting that Father was appropriate during these contacts. Meanwhile, Father had not yet discussed services with SSA, having missed his two appointments. He was a no-show for his first three random drug tests.

On December 3, 2019, the court sustained SSA's jurisdictional petition, and set the matter out for disposition.

On December 9, 2019, the paternal grandmother informed SSA she was no longer comfortable supervising visits, as the previous day (December 8) Father had been aggressive towards family members and police were called to her home. The

3

grandmother was instructed to tell the parents to arrange visits through SSA. On December 19, 2019, the paternal grandmother again noted her unease with supervising visits, stating that the parents were inconsistent with visitation. She reported that Father came over a day or two after the December 8 incident, banging on their door and becoming upset they had changed the locks. Meanwhile, Father was still not responding to SSA efforts to contact him, nor was he drug testing.

On January 14, 2020, minor was declared a dependent of the juvenile court and removed from parental custody. The parents were granted reunification services.

*Reunification Period*

As of SSA's principal report for the six-month reunification review hearing, J.G. was thriving in the paternal grandparents' home, and had adjusted well in their care, with J.G. described as a generally happy child. The paternal grandparents hoped for Father to commit to sobriety, but were prepared to adopt J.G. in the event reunification efforts proved unsuccessful.

Father's compliance with his case plan was described as "none." He had not even signed the case plan as he had not made himself available to the social worker. His case plan required him to participate in general counseling, domestic violence education, parenting education, substance abuse testing, a 12-step program, and a substance abuse outpatient or inpatient program. When the social worker finally reached Father by telephone, he hung up on her as she was explaining the importance of participating in services. He had been referred to random drug testing but had not participated at all. Father admitted that he was not sober and continued to use methamphetamine. He was transient during this period and sleeping in his car.

From mid-February through the end of March 2020, Father was incarcerated for domestic violence against Mother. He was on informal probation, which required him to complete a batterer's intervention program, drug test, and report to his

4

probation officer every evening. In June 2020, his probation officer reported Father was not participating in any of the probation ordered services and was in violation of his probation.

Father had been granted visitation three times per week for a total of six hours. Father never contacted SSA to arrange for visitation. The paternal grandmother reported Father would sometimes call her asking for food, but never inquired about the child.

On August 10, 2020, the juvenile court terminated the parents' reunification services and scheduled a .26 hearing for December 2020.

*Post-reunification Period*

Initial .26 Hearing Reports

SSA recommended terminating parental rights and freeing J.G. for adoption. The paternal grandparents remained committed to adopting minor.

Although Father's reunification services had been terminated, he was still entitled to visitation with the child. Father had two video visits with J.G. in early October 2020. However, he had his referral terminated due to multiple no shows, then reinstated, and then once again had the referral terminated for nonparticipation. He was incarcerated again in late October and called regularly to check on J.G. J.G. did not recognize Father's voice, but smiled and giggled during the calls. Father was released from jail on January 26, 2021.

Meanwhile, in late September 2020, Mother gave birth to another child, who was subsequently detained and made the subject of child protective proceedings in Merced County. Child protective services in Merced were recommending that reunification services be bypassed as to that child.

5

388 Petition

On February 3, 2021, Father filed a 388 petition requesting either resumed reunification services or J.G.'s placement in legal guardianship rather than adoption. The petition cited Father's approximately one year of sobriety and enrollment in drug treatment upon his release from jail, and, as to the child's best interest, declared "[a] son should be able to know his father, be raised by his father, and benefit from his father's company and commitment to sobriety. Future trauma stemming from identity as an adoptive child when his father wants to be his father will not benefit [J.G]."

Final .26 Hearing Reports

In early February 2021, Father's probation officer relayed that Father absented himself for the past year. Father did not enroll in required programs. He was constantly using drugs the prior year and high during some calls, and failed to drug test after a February 2020 positive result for methamphetamine. Shortly afterward, Father called the social worker and said that he was living in an inpatient treatment facility, poised to begin batterer's treatment, and had been sober for about a year. Father stated he had not requested visits because he was living on the streets, was trying to get sober, and had left in July 2020 to Northern California. He claimed to have proof of his sobriety from his probation officer and child services in a different county. In addition, Father had called the paternal grandparents three times to talk with J.G.

In early March 2021, a social worker from Merced County reported that her agency was recommending reunification bypass for Father since Father had not made himself available from the inception of the case and that Father did not initiate any services or drug testing with Merced County. That same day, Father's probation officer noted that Father had yet to provide proof of enrollment in any services. The social worker was able to obtain proof that Father was living in a transitional living program.

6

However, Father's case manager at the transitional living program had to obtain Father's consent to disseminate any case information.

As for visitation, Father had two in-person visits with J.G. at the paternal grandparents' home in mid-February, engaging in appropriate and affectionate interactions both times. Father continued to telephone the child, who now recognized him over the phone and called him "Papa."

Section 388/.26 Hearing

On March 15, 2021, the juvenile court granted Father a hearing on his 388 petition and promptly began the hearing. In addition to the testimony from Father and the paternal grandfather, the court accepted into evidence multiple enrollment confirmations for programs, and clean drug test results from late January 2021 through mid-March 2021 submitted by Father.

Testimony of Father

Father testified that he was incarcerated twice in 2020 in Orange County: first, from February 14, 2020, through March 29 of 2020; second, from October 30, 2020, through January 26, 2021. There were no services available during his incarceration due to the pandemic. He did not engage in services after his first release in early 2020 because he was homeless and was focused on getting off the streets and getting sober. The former incarceration was due to drug paraphernalia and possession of counterfeit bills, while the latter was due to violating a protective order as to Mother as well as violating probation. Father testified he had not used methamphetamine since mid-February 2020. He testified he stopped using drugs because he was incarcerated, which gave him a moment of clarity and he wanted to better himself. However, Father admitted to pleading guilty in November 2020 to possessing drug paraphernalia in April 2020.

Father had gone to Merced County without his probation officer's permission in the summer of 2020.

Father was now employed as a window washer. He entered his current in-house substance abuse program a couple days after his January 2021 release from custody. Father provided a release of information for the social worker the day before his testimony. He was participating in drug treatment. However, he had not attended any group meetings or therapy sessions due to his work schedule. Father enrolled in a batterer's treatment program in late February 2021 at the prompting of his probation officer and had attended two classes. Father was dealing with his drug abuse triggers. He also had four random drug tests at his residential program, all negative.

Father testified that his two recent supervised visits with J.G. went well, and he felt a connection with the minor.

Father testified he was being offered reunification services in Merced County. Father vowed to participate in services if offered additional reunification time.

Testimony of Paternal Grandfather

The paternal grandfather testified Father was working and "staying out of trouble," and had not used drugs for almost a year. The paternal grandfather agreed not to let Father into the home if he was under the influence of drugs, and to alert SSA of any concerns he had about Father in the event Father was granted renewed reunification services. Father had the characteristics to be a good father and was "very attentive" to J.G. during visits.

Ruling

On March 16, 2021, after argument from all counsel, the juvenile court noted Father had made some progress but "the reality is . . . that the rehabilitation process takes longer than a few weeks," and Father's circumstances could not be considered

8

changed.  In addition, "the legal focus of the case shifted from parents to child when reunification services were terminated."  The court denied Father's 388 petition.

The court turned to the .26 hearing the following day.  Father's counsel noted that Father had hoped the court would grant him further reunification services and merely lodged a generic objection to the prospective .26 hearing findings and orders.  He did not submit any additional evidence or offer any specific objection to terminating his parental rights.  The court adopted SSA's proposed findings and orders, terminating parental rights and freeing J.G. for adoption.  On March 26, 2021, Father's counsel filed a timely notice of appeal stating Father was appealing from the March 17, 2021 order terminating parental rights.

DISCUSSION

*Denial of the Section 388 Petition*

Father's notice of appeal is from the court's order on the .26 hearing, though his argument is primarily directed at the court's order denying his section 388 petition.  Nevertheless, because we liberally construe the notice of appeal, we will consider Father's arguments.  (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450-1451 [construing notice of appeal that only referenced termination order to also include order denying 388 petition].)  SSA agrees with this conclusion.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child."  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability [citation].'"  (*In re*

9

*Stephanie M.* (1994) 7 Cal.4th 295, 317.) Accordingly, "after reunification services have terminated, a parent's petition for . . . reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) "The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

Father's brief on appeal spends a great deal of time dwelling on whether he established a changed circumstance, but it hardly touches upon the issue of whether a change in the court's order would advance J.G.'s need for permanency and stability. Here is the extent of what Father has to say: "In the present case, when father was allowed personal visits, the visits went very well. The child seemed to really enjoy spending time with father. Father did all of the things a doting parent might do under such circumstances—play, soothe, and share love. The record in this case show[s] a very high level of interaction between Father and [J.G.] after services were denied."

The notion of a child's best interests was analyzed in detail in *In re Kimberly F.* (1997) 56 Cal.App.4th 519. That opinion encourages courts to examine three factors: "the seriousness of the reason for the dependency in the first place," "the existing bond between the parent and child," and "the strength of the child's bond to his or her present caretakers, and the length of time a child has been in the dependency system in relationship to the parental bond."[2] (*In re Kimberly F.*, at pp. 530-531.) That court was dismissive of "the notion that just because a parent makes relatively last-minute (albeit genuine) changes he or she is entitled to return of the child . . . ." (*Id.* at p. 530.) And it was particularly skeptical of such changes when the parent loses custody of a child due to drug addiction and does not comply with services during the

_____

[2]       This approach has been criticized on the ground that it gives too much weight to the parent's interests. (See *In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.)

reunification period: "It is the nature of addiction that one must be 'clean' for a much longer than 120 days to show real reform." (*Id.* at p. 531, fn. 9.)

None of these factors support changing the court's order, much less finding the trial court *abused its discretion* in refusing to change its order. A couple of enjoyable play dates simply are not enough, when compared with J.G.'s entire lifetime of successful bonding with the caretakers. There is an urgency to dependency proceedings involving very young children. (Compare § 361.5, subd. (a)(1)(A) [for children three years of age or older, parents shall be provided 12 months of reunification services] with subd. (a)(1)(B) [for children under three years of age, parents shall be provided six months of reunification services].) Here, J.G. was removed at birth and Father squandered his reunification period. While Father made a promising start in reforming his life, the time had come for J.G. to benefit from a permanent plan. Unfortunately for Father, his changes were made much too late in the process.

*The Beneficial Parent/Child Relationship Exception to Adoption*

Father also contends the court erred in terminating his parental rights because the parent/child-bond exception applied. (See § 366.26, subd. (c)(1)(B)(i) [exception to terminating parental rights where "termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship"].) "From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631.)

However, Father did not argue this exception to the trial court and thus waived the issue on appeal. At the .26 hearing, Father's counsel (not Father) merely appeared and lodged a generic objection to the court's ruling—he did not contend that the

11

parent/child-bond exception applied or request the trial court make findings on that exception. Father has "thereby waived the right to raise the issue on appeal. The juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies. [Citations.] The party claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies." (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.) In his reply brief, Father acknowledges he did not raise the issue in the trial court but requests we exercise our discretion to consider the issue anyway. Assuming we have such discretion, we decline to exercise it. A trial court's ruling on this exception is entitled to deference (*In re Caden C., supra,* 11 Cal.5th at pp. 639-640), which we cannot properly give if there is no ruling to begin with. Accordingly, the issue is waived.

DISPOSITION

The postjudgment orders denying Father's section 388 petition, terminating his parental rights, and selecting adoption as the permanent plan are affirmed.

MARKS, J.*

WE CONCUR:

FYBEL, ACTING P. J.

GOETHALS, J.

*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12